UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MICHAEL A. CALDWELL,

      Plaintiff,                   Case No.
                                     Hon:

v

GRETCHEN E. WHITMER, in her personal and
representative capacities, JOSEPH M. GASPER,
in his individual and representative capacities, and
the MICHIGAN STATE POLICE, an agency of
the State of Michigan,

      Defendants.

_____

James K. Fett (P39461)
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI  48169
734-954-0100
Fax: 734-954-0762
jim@fettlaw.com
Attorneys for Plaintiff

_____

**". . .[I]t is permissible to remedy *discrimination*. It is not permissible to remedy *disparity . . ." - Middleton v City of Flint*, 92 F3d 396, 406 (6th Cir 1996)**

**"Way too White and way too male" - *Defendant Gasper***

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

      Plaintiff Michael A. Caldwell, through his counsel, Fett & Fields, P.C., states the following claims against Defendants:

## NATURE OF CLAIM

1.      This is a *Fourteenth Amendment, 42 U.S.C. §1983 Equal Protection* and *Elliott-Larsen Civil Rights Act* action for damages and to end blatant racial and gender preferences implemented to (1) satisfy the Whitmer administration's clamor for affirmative action (racial and gender preferences) banned by referendum in 2006, and (2) placate minority advocacy groups that falsely accuse the Michigan State Police of institutional racism.  Plaintiff also asserts a retaliation claim based on his opposition to the illegal racial and gender preferences.

## JURISDICTION AND PARTIES

2.      Plaintiff invokes the jurisdiction of this Court pursuant to *28 U.S.C. §§1331, 1343(a)(3), 1343(a)(4), and 28 U.S.C. §1367*.

3.      The events giving rise to this cause of action occurred in the Western District of Michigan.

4.      The amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorney fees.

5.      Plaintiff is a White male, a citizen of the United States and the State of Michigan; he was a captain with the Michigan State Police ("MSP") until he was demoted to inspector for opposing Defendant's illegal racial and gender preferences.

6.      Defendant Gretchen E. Whitmer is the duly elected Governor of Michigan and an ardent proponent of the affirmative action preferences prohibited by the *Michigan Constitution of 1963, Art I, § 26*, which she euphemistically refers to as "Diversity."  See **Exhibit A.**

7.      The Defendant Michigan State Police is the state's premier law enforcement agency; as a para-military organization, its members scrupulously follow policy and orders issued by superiors.

8.      Defendant Joseph M. Gasper is the Director of the MSP and the architect of the MSP's most recent "affirmative action" policy (the "Affirmative Action Directive") designed to displace White males at all levels of the MSP with minorities and females.

9.      To this end, Defendant Gasper has directed that the MSP set aside 25% of its positions for minorities and 20% for females throughout its ranks even though these percentages cannot be achieved without lowering standards and discriminating against White males in favor of minorities and females; in any event, the relevant qualified work force is inadequate to fill these set asides.

## MSP'S STORIED HISTORY OF RACIAL PREFERENCES

10.     The MSP's storied history of racial and gender preferences stretches all the way back to the early 1980s.

11.     It was then that the MSP adopted unconstitutional measures to increase the number of blacks in its ranks.

12.     One such measure "Augmentation," implemented in 1981, entailed lowering the entrance and promotional standards for blacks and eventually females.

13.     "Augmentation" allowed minorities and females to qualify for promotion to sergeant with test scores of 83 and above, while White males qualified only with scores in the middle to high 90s, depending on the year and quota for minorities. See *Herendeen v MSP,* 39 FSupp 2d 899, 902-903 (WD Mich 1999).

14.     Command officers were also ordered to consider race and gender each and every time they made promotions from the discriminatorily assembled applicant pool.  See *Herendeen,* 39 FSupp 2d at 904.

15.     The MSP has conceded in other litigation that it achieved representation of minorities and females in its workforce which exceeded their representation (percentage) in the relevant qualified workforce in the early 90s; there has been a judicial finding to this effect as well.

16.     The MSP continued these naked racial and gender preferences through the 1990s until courageous Trooper Thomas A. Cremonte in 1996 obtained an injunction barring racial and gender preferences in promotions.  See **Exhibit B.**

17.     The MSP soon violated the injunction and were ordered by the Court to cease and desist; old habits die hard and the MSP continued to discriminate against White males in hiring, promotion and discipline, albeit in a more nuanced, covert manner.

18.     Despite the injunction and the fact that it is undisputed that the MSP never engaged in institutional racial or gender discrimination, preference proponents within and without the MSP continued to demand measures to equalize the percentage of minorities in the MSP *workforce* with their percentage in the *population*, which are unconstitutional.  *Middleton v. City of Flint,* 92 F3d 396, 406 (6th Cir. 1996) (That is ". . .[I]t is permissible to remedy *discrimination*.  It is not permissible to remedy *disparity* without more. . ." (emphasis in original)).

19.     The preference proponents made these demands despite the fact that the percentage of Blacks and females in MSP's *workforce* exceeded their percentages in the *relevant qualified workforce* and for Blacks, during most periods, their percentage exceeded their percentage of the *population*.

20.     Similarly, the appointment of 2 Black males, a Hispanic and a female to the Director position failed to appease the preference proponents.

21.     Because of the pressure brought to bear by White male litigants, the MSP did not acquiesce to the demands of the preference proponents by reinstituting the naked racial and gender

preferences referenced above (it did continue with the covert, less effective, more nuanced measures, to be sure).  See e.g. *Cremonte v MSP, Keuhn  v MSP, Herendeen v MSP, Krafft v MSP, Lesnau v MSP, Galbraith v MSP and Breedveld v MSP.*

22.     The preference proponents were further stymied by the Michigan Civil Rights Initiative, a referendum which culminated in amendment of the Michigan Constitution effective December 23, 2006 to bar racial and gender preferences in government employment, contracting and college admissions, see *Art 26, Affirmative Action*; Defendant Whitmore vigorously and very publicly opposed this referendum.

23.     Michigan's specific constitutional prohibition on racial and gender preferences dressed up as "affirmative action," as well as the overwhelming popular opposition to preferences everywhere, required Defendants and others to rebrand racial and gender preferences as "diversity" or "equity and inclusion" policies.

24.     Defendants now disingenuously characterize their racial and gender preferences as "Valuing Diversity and Inclusion," when in fact the MSP does not value White males and is in fact making great efforts to exclude them.

25.     The labels may have evolved but not Defendants' clamor for illegal racial and gender preferences.

## BLACK ADVOCACY GROUPS REIGNITE CLAMOR FOR RACIAL PREFERENCES

26.     The latest impetus for aggressive racial preferences came when then MSP Director Kriste Kibbey Etue in September 2017 had the temerity to post on her personal Facebook page a meme consisting of a picture of Black NFL players kneeling during the National Anthem with the following message superimposed:

> *Dear NFL:  We will not support millionaire ingrates who hate America and disrespect our Armed Forces and Veterans.  Who wins a football game has ZERO impact on our lives.  Who fights for and defends our nation has every impact on our lives.  We stand with the Heroes, not a bunch of rich, entitled, arrogant, ungrateful, anti-American, degenerates. Signed, We the people.*

27.     The outcry from the black advocacy groups was swift and furious.

28.     Despite apologizing repeatedly for exercising her Constitutional right to freedom of speech, these black advocacy groups continued to vilify Director Etue and the MSP.

29.     Then Governor Snyder had the courage to resist the call for Director Etue's resignation and she continued in her position until the end of Snyder's term.

30.     Defendant Governor Gretchen E. Whitmer took office on January 1, 2019, and appointed Defendant Gasper as Director with the mandate to increase the percentages of minorities and women in the agency (see **Exhibit A**), even though it was clear to all that this could be accomplished only by trammeling the rights of White male applicants and long-serving White males.

## ROLL OUT OF AFFIRMATIVE ACTION DIRECTIVE TO DISPLACE WHITE MALES WITH MINORITIES AND FEMALES

31.     Defendant Gasper on February 6, 2019 convened a Director's Meeting at MSP headquarters where he announced that the number one priority of the agency was affirmative action preferences, which he euphemistically referred to as "diversity."

32.     In attendance were Inspector level and above enlisted and civilian personnel.

33.     Defendant stated that "diversity" was to be achieved at all levels of the MSP through the recruiting and promotional processes and the "Department can't look like the 80% that the Department looks like now.  We need to look at that smaller number and increase it."

34.     He also emphasized that gender, race and life experiences carried the same weight as experience and seniority in selecting candidates for hire and promotion.

35.     Regarding minority and female recruiting, Defendant Gasper stated that "brushes with the law should not necessarily be a disqualifying factor."

36.     At the Spring Director's Meeting on May 13, 2019, Defendant Gasper again emphasized that the number one priority for the agency is affirmative action and spoke at length about the importance of diversifying all ranks of the MSP.

37.     At the MSP Fall Forum on October 8, 2019, Defendant Gasper again reiterated how the number one priority in the Department is affirmative action preferences for minorities and females, which he continued to call "diversity."

38.     He also spoke at length about how the MSP is **"way too White and way too male;"** he then revealed that as part of the Affirmative Action Directive the MSP was to set aside 25% of the positions within the MSP for minorities and 20% for females.

39.     On October 9, 2019, Plaintiff and his immediate report, Inspector Michael Hahn, attended the Field Operations Bureau Meeting chaired by Lieutenant Colonel Arnold, who reported to Defendant Gasper.

40.     The meeting was held to have a "difficult discussion" that Defendant Gasper had earlier promised regarding the racial and gender preferences and the consequent demographic changes in the MSP.

41.     Lieutenant Colonel Arnold began the meeting by asking the group what they thought of Defendant Gasper's Affirmative Action Directive.

### PLAINTIFF AND INSPECTOR HAHN
### OPPOSE RACIAL AND GENDER PREFERENCES

42.     Captain Caldwell began the discussion by stating that he was concerned about how the "Affirmative Action Directive" was negatively affecting the White males under his command, explaining that the term "White male" has taken on a negative connotation within the MSP lately

and that the term is almost always used in a negative light.

43.     Caldwell also went on to state that White male commanders joined the department to serve the people of Michigan and had aspirations of assuming leadership roles in the profession and agency they chose to devote their lives to; he reminded everyone that White males did not choose to be born White males, they just were; like everyone else in the world, they did not choose their race or ethnicity, but in the current departmental culture, they feel like they are being excluded from promotional opportunities because they are White males.

44.     Caldwell then rhetorically asked, when the Director publicly states the number one priority of the department is to "diversify" the upper ranks of the MSP, how does that foster an atmosphere of inclusion for the members who are not identified as female or minority?

45.     Plaintiff and Inspector Hahn opposed Defendant's Affirmative Action Directive, stating:

        a.   recruiting and promotions should be based on merit only;

        b.   it was not the MSP's fault that it was a majority White male agency; and

        c.   given that the MSP was a majority White male agency, it was statistically reasonable to expect that the majority of MSP members that have risen to the upper command echelon are White males.

46.     Inspector Hahn also criticized the MSP "hand-wringing over demographics," stating that it was an unwise response to the false claims of institutional racism by Black advocacy groups in the wake of Retired Colonel Etue's race-neutral Facebook post.

47.     On December 12, 2019, Plaintiff attended Equity and Inclusion Officer Inspector Lisa Rish's presentation on "Diversity and Inclusion" at the MSP Cadillac Post; in attendance were MSP members from the Cadillac Post, the Special Investigations Section and the Task Force Section, approximately 40 members in all.

48.     Plaintiff expressed concerns about the Affirmative Action Directive and the fact that the term "White male" has taken on a negative connotation within the MSP, prompting a contentious discussion.

49.     Plaintiff inquired how the MSP's "Women in Law Enforcement Leadership" seminars fostered a feeling of "inclusion" by male MSP members, to which Rish replied by suggesting a leadership seminar for males only; after her suggestion was greeted with moans and laughter, Rish immediately recognized the folly of the MSP sponsoring such a seminar and remarked "Well, maybe not."

50.     Rish related how uncomfortable she felt arriving at the Brighton Post as the only female trooper there at the time; Plaintiff commented that:

      a. Rish's experience occurred over 20 years ago and the MSP had evolved since then, just like the rest of society;

      b. today, when a female trooper arrives at a post, nobody thinks twice about it and they are accepted and welcomed just like any male trooper;

      c. members have grown weary of decades old stories of racism and sexism in the MSP, noting that the agency had already had its first female director, 2 Black directors, a Hispanic director and many other high-ranking minority and female officers; and

      d. the MSP has been very progressive for many years in hiring and promoting women and minorities, and 30 years ago when he was in recruit school there were several Black MSP captains, including Equity Officer Captain Jack Hall.

51.     Rish was very unhappy that Plaintiff had shared these views.

52.     In addition to the above protected opposition activity, Plaintiff also engaged in protected activity by aiding and encouraging Inspector Hahn in the exercise and enjoyment of his rights under state and federal discrimination laws.

## "AFFIRMATIVE ACTION DIRECTIVE" IS MSP STANDARD OPERATING PROCEDURE, A PATTERN AND PRACTICE

53.     Coming from the top official of a para-military organization, Defendant Gasper's "Affirmative Action Directive" constitutes standard operating procedure, a pattern and practice of racial and gender preferences designed to displace White males with minorities and females at all levels of the agency.

54.     Consequently, MSP has begun a purge of White male command officers as the MSP has begun demoting or terminating them to make way for minorities and females that must make up a quarter of its ranks.

55.     Pursuant to Defendants' "Affirmative Action Directive," the MSP has

    a.  excluded White male applicants to the extent that a recent applicant roster contains not one White male candidate (see **Exhibit C**);

    b.  promoted less qualified minorities and females rather than White males with far superior employment records and experience;

    c.  converted high-level command officers from classified civil servants to at-will employees by means of mandatory two-year contracts for newly promoted captains and above, thus paving the way for their certain dismissal by non-renewal of contracts, and replacement with minorities and females who will, by then, be eligible for promotion to those ranks;

    d.  imposed harsh discipline on White males and little or no discipline on minorities and females for offenses of comparable seriousness; and

    e.  tied command bonuses to discriminating against White males.

56.     Defendants' "Affirmative Action Directive," on its face and as applied, violates:

    a.  the *Michigan Constitution* which provides:

        (i)  in *Art I, §2*:

            Sec. 2  No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. . .

10

(ii)     in *Art XI, §5* provides that MSP promotions are to be "determined by competitive examination and performance on the basis of merit, efficiency and fitness and not based on "religious, racial or partisan considerations."

(iii)     in *Art I, §26. Affirmative Action*:

(2) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity or national origin in the operation of public employment. . .

b.    the injunction entered in *Cremonte v Michigan State Police,* ("Plaintiff may have injunctive relief, enjoining Defendant from making promotions based upon criteria other than which is contained in the 1963 Constitution, Art XI, § 5.") and

c.    the *Federal Constitution, Amendment XIV, §1* which provides: " . . . nor shall any state deny to any person . . . the equal protection of the laws."

57.    Notably, the purpose of Defendants' "Affirmative Action Directive" is *not* to remedy past discrimination (which was remedied long ago) or for operational needs.

58.    Rather, Defendant Gasper issued the "Affirmative Action Directive" to (1) satisfy the Whitmer Administration's clamor for the affirmative action preferences barred by Art I, §26 of the Michigan Constitution of 1963, and (2) placate Black advocacy groups that falsely accuse the MSP of institutional racism.

## DEFENDANT'S RETALIATION AGAINST PLAINTIFF

59.    Plaintiff joined the MSP in 1990 after serving his country in the United States Marine Corps; he is 54 years old.

60.    Through hard work and dedication, Plaintiff attained the rank of Captain; some of his accomplishments are listed in **Exhibit D**.

61.    Plaintiff has an exemplary employment record as confirmed by his evaluations.

62.    Neither Defendant Gasper nor the MSP disciplined Plaintiff until he opposed Defendants' Affirmative Action Directive.

63.    Shortly after Plaintiff engaged in opposition activity the MSP, in late October 2019, began investigating Inspector Hahn for following his orders regarding an interview process for a transfer; the MSP required the interview process despite the fact that all concerned knew that the transfer request would never be granted.

64.    Plaintiff's supervisor, Lt. Colonel Arnold, told him that he, Plaintiff, retained discretion to deny the transfer request, but that he had to go through the motions of the interview process.

65.    Plaintiff informed the transfer applicant, Dt. Lt. Bush, before the interview process that his request would be denied; Bush elected to proceed with an interview anyway so that he could tell his wife that he had done everything possible to obtain a transfer to Gaylord.

66.    Plaintiff directed Hahn to convene an interview panel and otherwise "go through the motions;" Hahn initiated the interview process and otherwise went through the motions as directed during October 2019.

67.    Plaintiff denied the transfer request and nobody was surprised - until the MSP, after a 2.5 month rigged investigation, on March 13, 2020, terminated Hahn and demoted Plaintiff to Inspector for obviously pretextual reasons scoffed at by veteran members of the MSP.

## COUNT I
## RACE AND GENDER DISCRIMINATION IN VIOLATION OF 42 U.S.C. §1983 (FOURTEENTH AMENDMENT EQUAL PROTECTION)

68.     Plaintiff incorporates by reference the preceding paragraphs.

69.     Plaintiff was a high-performing White male command officer with a sterling employment record until wrongfully terminated by Defendant MSP.

70.     Defendants were acting under the color of state law when they jump-started the MSP standard operating procedure (pattern and practice) of racial and gender preferences in the terms and conditions of employment (as described above), much to the detriment of White males.

71.     Defendants deprived Plaintiff of his right to Equal Protection as guaranteed by the *14th Amendment to the United States Constitution* by:

      a.  requiring him to abide by the "Affirmative Action Directive" and thereby violate his oath of office which provides:

      ". . . I do further solemnly swear that I will faithfully enforce the laws of this state, discharging the duties of an officer of the Michigan State Police and will preserve, protect and defend the Constitution of the United States and the Constitution of this state. . ."; and

      b.  demoting him for pretextual reasons based on his status as a White male.

72.     Defendants are the usual governmental employers that discriminate against White males.

73.     Defendants' illegal race and gender discrimination has caused Plaintiff damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants providing for:

      a.  Economic damages;

      b.  Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, as a result of Defendant's illegal actions;

    c.   Costs, interest and reasonable attorney fees as provided by 42 U.S.C. §1988;

    d.   Punitive damages against Defendants in their personal capacities;

    e.   Reinstatement to the rank of Captain and an injunction against Defendants' illegal racial and gender preferences;

    f.   A declaration that Defendants' conduct as described above violates the state and federal constitutions and statutes; and

    g.   Such other equitable relief as the Court deems just.

## COUNT II - 42 USC §1983 RETALIATION

74.    Plaintiff incorporates by reference each of the preceding paragraphs.

75.    Plaintiff engaged in protected activity under 42 USC § 1983 by opposing the MSP's racial and gender discrimination against himself, those under his command in the Seventh District and all other members of the MSP.

76.    Defendant MSP demoted Plaintiff because he opposed the Affirmative Action Directive's racial and gender preferences.

77.    Defendant's demotion of Plaintiff on this basis violates 42 USC § 1983.

78.    As a proximate result of Defendants' illegal conduct, Plaintiff has suffered, and will continue to suffer, emotional distress, especially outrage, lost opportunities, loss of reputation, embarrassment and the physical manifestations of these injuries, as well as economic damages.

WHEREFORE Plaintiff requests that this Court enter judgment against Defendants providing for:

    a.   Economic damages;

    b.   Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, as a result of Defendant's illegal actions;

    c.   Costs, interest and reasonable attorney fees as provided by 42 U.S.C. §1988;

    d.   Punitive damages against Defendants in their personal capacities;

e. Reinstatement to the rank of Captain and an injunction against Defendants' illegal racial and gender preferences;

f. A declaration that Defendants' conduct as described above violates the state and federal constitutions and statutes; and

g. Such other equitable relief as the Court deems just.

## COUNT III
## DISCRIMINATION IN VIOLATION OF THE ELCRA
## AND ART. I, §26 OF THE MICHIGAN CONSTITUTION

79.    Plaintiff incorporates by reference the preceding paragraphs.

80.    Plaintiff is a White male.

81.    Defendants demoted Plaintiff based on his status as a White male.

82.    That is, Plaintiff's status as a White male was at least a factor, if not the only factor, that made a difference in Defendants' decision to demote Plaintiff.

83.    Defendants' demotion of Plaintiff violates the Elliot-Larsen Civil Rights Act and Mich Const 1963, Art 1, §26.

84.    As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff has suffered, and will continue to suffer emotional distress, including humiliation, loss of reputation, outrage and economic loss.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants providing for:

a. Economic damages;

b. Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, as a result of Defendant's illegal actions;

c. Costs, interest and reasonable attorney fees as provided by 42 U.S.C. §1988;

d. Punitive damages against Defendants in their personal capacities;

    e.   Reinstatement to the rank of Captain and an injunction against Defendants' illegal racial and gender preferences;

    f.   A declaration that Defendants' conduct as described above violates the state and federal constitutions and statutes; and

    g.   Such other equitable relief as the Court deems just.

## COUNT IV - RETALIATION IN VIOLATION OF ELCRA

85.    Plaintiff incorporates by reference each of the preceding paragraphs.

86.    Plaintiff engaged in protected activity under ELCRA and Art I, §26 of the Michigan Constitution of 1963 by opposing the MSP's racial and gender discrimination against himself, those under his command in the Seventh District and all other members of the MSP.

87.    Defendants retaliated against Plaintiff because he opposed racial and gender preferences and aided and encouraged Inspector Hahn in the exercise and enjoyment of his rights under state and federal discrimination law.

88.    Defendants' demotion of Plaintiff on this basis violates ELCRA, MCLA 37.2701(a) and (f).

89.    As a proximate result of Defendants' illegal conduct, Plaintiff has suffered, and will continue to suffer, emotional distress, especially outrage, lost opportunities, loss of reputation, embarrassment and the physical manifestations of these injuries, as well as economic damages.

WHEREFORE Plaintiff requests that this Court enter judgment against Defendants providing for:

    a.   Economic damages;

    b.   Non-economic damages to compensate for the mental and emotional distress, outrage, and humiliation he has suffered, and continues to suffer, as a result of Defendant's illegal actions;

    c.   Costs, interest and reasonable attorney fees as provided by 42 U.S.C. §1988;

    d.   Punitive damages against Defendants in their personal capacities;

    e.  Reinstatement to the rank of Captain and an injunction against Defendants' illegal racial and gender preferences;

    f.  A declaration that Defendants' conduct as described above violates the state and federal constitutions and statutes; and

    g.  Such other equitable relief as the Court deems just.

Respectfully submitted,

*/s/ James K. Fett*
By:  James K. Fett (P39461)
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI  48169
734-954-0100
jim@fettlaw.com
Dated:  May 11, 2020    Attorneys for Plaintiff

<u>Affidavit of Mailing</u>

I hereby certify that on **May 11, 2020**, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  **not applicable,** and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  **not applicable.**

*/s/ James K. Fett*
James K. Fett
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI  48169
734-954-0100

# JURY DEMAND

    NOW COMES Plaintiff Michael A. Caldwell, through his counsel Fett & Fields, P.C., and hereby demands trial by jury in the above-captioned matter.

*/s/ James K. Fett*
By:  James K. Fett (P39461)
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI  48169
734-954-0100
jim@fettlaw.com
Dated:  May 11, 2020    Attorneys for Plaintiff

<u>Affidavit of Mailing</u>

I hereby certify that on **May 11, 2020**, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  **not applicable,** and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants:  **not applicable.**

*/s/ James K. Fett*
James K. Fett
Fett & Fields, P.C.
805 E. Main St.
Pinckney, MI  48169
734-954-0100
