STATE OF MICHIGAN
COURT OF CLAIMS
* * * * * * * * * * * *

**THOMAS A. CREMONTE,**

    Plaintiff,

v

**MICHIGAN STATE POLICE,** an
agency of the **STATE OF MICHIGAN,**

    Defendant.

_____/

Court of Claims
Case No. 95-15727 CM

Consolidated with Livingston County
Circuit Court Case No. 94-13442 NO

TRUE COPY
DANIEL A. BURRESS
44th CIRCUIT COURT

## OPINION

Plaintiff, Thomas A. Cremonte, filed this two-count Court of Claims complaint against the Michigan Department of State Police on April 12, 1995. In Count I, paragraph 10 of his Complaint, Plaintiff alleges that Defendant's actions of refusing to promote him are "contrary to the public policy embodied in the Michigan and United States Constitutions." In Count II, paragraph 13, Plaintiff alleges that the actions and policies of the State Police constitute a "denial of Plaintiff's right to equal protection of the laws as guaranteed by the 14th Amendment to the United States Constitution and the Michigan Constitution."

This action was transferred to this Court and consolidated with the above captioned Elliott-Larsen Civil Rights Action then pending here. Trial of these cases commenced on January 30, 1996, and continued on January 31, February 2nd, 5th, 6th, 7th, 9th, 20th, 21st, and 22nd. The following were called as witnesses, either live or through deposition: Colonel

1



Michael Robinson, Trooper Donald Arbic, Chief Robert Krichke, Trooper Barry Lewis, Dr. Martin Wing, Livingston County Prosecutor David Morse, Plaintiff Trooper Thomas Cremonte, Deborah Gilmore, Trooper Therese Fogarty-Cremonte, Chief William Smith, Lt. Chris Lewis, Lt. Thomas Finco, Lt. Dianne Garrison, Captain Christopher Hogan, Lt. Michael Knuth, Lt. Shelby Slater, Lt. Britt Weber, Lt. John E. Behnke, Captain Timothy Barker, Captain James Cox, Lt. Steven Brown, Lt. Col. James Bolger, Charles Green, Shirley England, Lt. Robert Young, Prof. Dennis Gilliland, Captain Philip David Charney, Captain Gene Hoakwater, Trooper Daniel Keuhn, Chief (Retired) Michael Oyler, Michael Vance, and Dennis Diggs.

Sixty-six (66) exhibits were received into evidence. The jury rendered judgment in favor of Plaintiff in the sum of $850,000 in the Circuit Court action. The parties agreed that the opinion in this case would not be rendered until they had the opportunity to submit detailed proposed positions following receipt of the jury verdict in the Circuit Court action. Each party has submitted their proposals which have been considered by the Court.

Many of the essential facts involved in this matter are hotly disputed.

Plaintiff is a classified civil servant employed by the Michigan State Police as a trooper. He began his employment with the Michigan State Police in 1977, and is presently assigned to the Brighton Post. The gravamen of his complaint is that less qualified minorities (i.e., women, African-Americans and Hispanics) have been promoted to sergeant over himself, a white male.

His contention is that he is a victim of race and gender discrimination as a result of the Michigan Department of Civil Service's policy of "augmented certification," which, according to Plaintiff, is contrary to public policy and violates his constitutional equal protection rights.

Augmented certification was a process used by the State Police to place members of protected classes into the pool of applicants considered for a given promotional position. Protected classes or groups include females, Afro-Americans, Hispanics, American-Indians, and Asians.

A trooper's score on the promotional examination determines eligibility for promotion. The applicant's scores are divided into bands.[1] Those achieving a score of 92-100 were placed in the first band, while those whose score was 83-91 were placed in the second band. Under Civil Service rules and procedures, there must be at least three candidates for an appointment or promotion to be made by the appointing authority. When a promotional opening becomes available in a particular geographical area, a list of qualified candidates is forwarded to the hiring agency for consideration.

In regions of the State where underutilization of protected persons exists, the list of persons eligible for promotion is "augmented" by adding to it the names of protected group members from successively lower bands, until the total number of names of the protected group equals three or more. Under this system all first banders were eligible for promotion.

---

[1] This practice was discontinued June 27, 1994. From May 1987 until June 27, 1994, the scores were divided into four bands. To address concerns that the applicant pool was limited, (9-15 applicants) the bands were widened into two bands. Those with scores of 100-83 are placed in the first band, and those with scores of 82-70 are placed in the second band. The Circuit Court action was commenced March 15, 1994. The Court of Claims action was filed April 12, 1995. This Opinion address the bands as they existed at the time that these consolidated cases were filed.

3

However, when the list of first banders contained an insufficient number of eligible candidates from a underutilized protected group, the list is augmented by adding to it the names of protected persons from lower bands of test scores. Thus white males from the second band did not have the same promotional opportunities as protected persons from the second band.

Plaintiff first took the sergeant promotional examination in 1984. He testified that he was interested in any promotional assignment, except in the upper peninsula or thumb area. For all practical purposes Plaintiff was ineligible for promotion from 1984 through May, 1993 because he was a second band white male.[2] In both 1993 and 1995 he scored in the high first band. He claims that he continues to suffer discrimination, along with all other white males, even though he is now in the first band. This is because Defendant considers race and gender in its promotional decisions.

Defendant's affirmative action programs for 1989 and forward set a goal of 13% for minority group representation in the law enforcement personnel ranks.[3] As of September 1, 1991, minority group officers comprised 12.8% of all enlisted personnel.[4] Minorities comprise approximately 17% of the enlisted ranks, including troopers, sergeants and above.[5]

---

[2] Protected persons from the second band would have moved into the augmented list of promotional candidates, while white males in the second band were not so shifted.

[3] Minorities include African-Americans, Hispanics, American Indians, and Asians. Consent Decree, United States District Court Western District, Southern Division, Civil Action No. G75-472-CA5. Exhibit 21, p. 26. Exhibit 22, p. 25. This Court notes that the "Goals and Timetables" section of these two exhibits appears to be identical.

[4] Exhibit 22, p. 14.

[5] Testimony Lt. Steven Brown February 6, 1996.

In 1994, minorities comprised at least 13.5% of the workforce.[6] As far back as 1990 minorities held 13.4% of the positions in occupational categories applicable to Plaintiff.[7] Despite this attainment in the Michigan State Police workforce, Defendant, pursuant to the Preference Policy, gave 16.8% of the sergeant promotions to minorities during the period 1993-1995.[8]

Trooper Cremonte started with the Michigan State Police in 1977. He has had various assignments since that time. In 1983 the Department evaluated him for promotional potential.[9] He was described as:

> . . . a very dedicated employee who displays an intense spirit and possesses a unique awareness in the area of criminal investigation. . . . his stamina and enthusiasm during prolonged and arduous investigations appears to be endless. . . . The respect and confidence which is afforded him by his fellow officers is exceptional. . . . Cremonte is an exceptional Detective and is definitely capable of performing the duties of a first line supervisor. His abilities by far exceed that which would be considered acceptable for the position applied for.

He also established that he received a local Trooper of the Year award in 1987, was involved in the organization and operations of a local drug enforcement unit, received a B.B.A. from Cleary College (3.85 GPA), had Post Commander and Sergeant recommendations for promotion, and had experience as Acting Sergeant at the Brighton Post.

---

[6] Judicially notice fact, Exhibit P.

[7] Exhibit 21, Attachment D: Uniform Sergeants (Technicians, 8.6%), Uniform Troopers and Detective Sergeants (Protective Services, 14.6%).

[8] Exhibit J.

[9] Exhibit 44. Promotional potential evaluations are no longer utilized by the Department, and were criticized as being too subjective by ranking officers who testified on the subject.

Other witnesses testified to his many good attributes and qualities. Even those witnesses who were called to testify against him attested to his unique ability in the field of drug enforcement. He attributes his lack of promotion to discriminatory practices and policies and to the Department's displeasure concerning his complaints to the Director about what he considered to be unconstitutional and illegal practices in the hiring and promotional process.

Defendant, on the other hand, denies any unconstitutional or illegal practices in the promotional process, and claims that Trooper Cremonte was not promoted for reasons directly related to his own style of doing things. They point out that he questions the authority of supervisors who issue orders that he disagrees with, is not a team player, is too independent and prefers to do things his way despite contrary directions from supervisors, is too strong willed, inflexible, and set in his ways, is not known by some post commanders who have filled sergeant vacancies at their posts, is a poor role model and mentor for new troopers, has indicated a lack of interest in performing the administrative skills of a sergeant, and stereotyped individual members of the State Police based on their skin color and gender.

It is probably an understatement to observe that this case was vigorously contested on both sides. Plaintiff presented what he thought to be his qualifications and reasons why he should have been promoted, and evidence concerning the promotional policies and practices of the Department. Defendant brought out what it thought to be many non-discriminatory and otherwise valid reasons why, in its opinion, Trooper Cremonte was not promoted, and denied any violation of the Constitution or laws. This was met by a response from Trooper Cremonte which demonstrated that other ranking officers within the organization were promoted or retained following disclosure that they too were not perfect.

It is unnecessary to do more than note the existence of this testimony in arriving at a decision in this matter.

**PLAINTIFF'S PUBLIC POLICY CLAIM**

The Michigan Constitution of 1963 provides:

Art. I, § 2

No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

Art. XI, §5

State Trooper promotions are to be:

determined by competitive examination and performance on the basis of merit, efficiency and fitness.

Further that:

No person shall be appointed to or promoted in the classified service who has not been certified by the commission as qualified for such appointment or promotion. No appointments, promotions, ... in the classified service shall be made for religious, racial, or partisan consideration.

. . .

Violation of any of the provisions hereof may be restrained or observance compelled by injunctive or mandamus proceedings brought by any citizen of the state.

Plaintiff claims that he was denied promotion in part, because he opposed violations of the Michigan Constitution. Specifically, in response to a survey request from Colonel

7

Davis, he wrote a memo objecting to the hiring and promotional policies of the Michigan State Police.[10]

Each of the parties has relied upon *Vagts v Perry Drug Stores,* 204 Mich App 481, (1994). In that case the Court of Appeals summarized the three forms of "public policy" claim in the following manner:

> Generally, employment relationships are terminable at will, with or without cause, "at any time for any, or no, reason." *Suchodolski v Michigan Consolidated Gas Co.,* 412 Mich 692, 694-695; 316 NW 2d 710 (1982). "However, an exception has been recognized to that rule, based on the principle that some grounds for discharging an employee are so contrary to public policy as to be actionable." *Id.* at 695. These grounds are "[m]ost often ... found in explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty." *Id.* (first exception). " [C]ourts have also occasionally found sufficient legislative expression of policy to imply a cause of action for wrongful termination even in the absence of an explicit prohibition on retaliatory discharges" such as "where the alleged reason for the discharge ... was the [employee's] failure or refusal to violate a law in the course of employment." *Id.* (second exception). Courts have also "found implied a prohibition on retaliatory discharges when the reason for a discharge was the employee's exercise of a right conferred by a well-established legislative enactment."*Id.* At 695-696. (third exception).
> *Vagts v Perry Drug Stores,* 204 Mich App 481, 484 (1994).

Defendant argues that all three forms of a "public policy" claim set forth in *Suchodolski,* supra, require the discharge of an employee before the Courts have recognized a public policy claim. Defendant suggests, as noted in *Vagts,* that the first of the three grounds has probably been eliminated by the Supreme Court's holding in *Dudewicz v Norris-Schmid Inc,* 443 Mich 68; 503 NW 2d 645 (1993); since the Elliott-Larsen Civil Rights Act provided a remedy for someone discharged or retaliated against for opposing a violation of

---

[10] Exhibit 2.

the Act. They further point out that Plaintiff has availed himself of the remedies of that Act. However, Plaintiff argues that the Elliott-Larsen Civil Rights Act prohibits retaliation for opposition to a violation of the Elliott-Larsen Civil Rights Act, not to a violation of the Michigan Constitution.

Each of the parties has skillfully argued the facts concerning the weight of the voluminous testimony on the subject of the reasons why Trooper Cremonte should have been, or was not promoted. It is clear to this Court that the Michigan State Police is a close knit organization and that his letter to the Colonel was a major factor causing Trooper Cremonte's star to fall. The obvious result of writing such a letter was best summarized by the testimony of Lt. Steven Brown who characterized Cremonte as being a "very brave or very foolish individual" for voicing his opinion with respect to protected groups. The defense has not argued that he was brave.

A "public policy" cause of action may be found in explicit legislative statements prohibiting the discharge, discipline or other adverse treatment of employees who act in accordance with a statutory right or duty. Here the plaintiff openly opposed violations of the constitutional provision which requires that promotions be determined by competitive examination and performance on the basis of merit, efficiency and fitness, and that no promotion is to be made for religious, racial or partisan consideration. He claims that, as a result, Defendant retaliated against Plaintiff by not promoting him, in spite of his obvious qualifications.

In the Circuit Court Elliott-Larsen Civil Rights action, Plaintiff amended his complaint to include claims of discrimination on the basis of age, gender, race and retaliation for

expressing his opinion with respect to those policies. In his Court of Claims complaint, at ¶9 of his public policy claim, Plaintiff alleges that "Defendant refuses to promote Plaintiff because he expressed the view that Defendant should treat all troopers equally irrespective of age, race, or gender." Both actions allege retaliation based on the same conduct of Plaintiff. A public policy claim is sustainable only where there is not also an applicable statutory prohibition against retaliation for the conduct at issue. *Dudewicz v Norris-Schmid Inc,* 443 Mich 68, 80; 503 NW 2d 645 (1993). The Elliott -Larsen Civil Rights Act prohibits retaliation "against a person because the person has opposed a violation of [the] act, or because the person has made a charge, . . . under this act." As a result, because the Elliott -Larsen Civil Rights Act provides relief for the conduct alleged herein, his public policy claim is not sustainable.

**CONSTITUTIONAL CLAIM**

The Michigan Constitution of 1963 provides:

Art. I, § 2

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

A claim for damages against the state may be brought where the state violates the Michigan Constitution. *Smith v Dept of Public Health,* 428 Mich 540, 544; 410 NW2d 749 (1987). A plaintiff states a constitutional claim by showing that, by virtue of a custom or policy, the state deprived the plaintiff of a constitutional right. *Marlin v Detroit (After*

10

*Remand)*, 205 Mich App 335, 338; 517 NW2d 305 (1994); *Johnson v Wayne Co*, 213 Mich App 143; 540 NW2d 66 (1995).

Plaintiff has challenged Defendant's affirmative action plans[11] alleging that they embody an illegal preference. The policy challenged herein is remedial governmental action in classification of civil service employees. These classifications, known as protected groups, are challenged in three categories, race-based, gender-based, and age-based.

> Equal protection of the law is guaranteed by both the federal and state constitutions. US Const, Am XIV; Const 1963, art 1 § 2. The equal protection guarantee requires that persons in similar circumstances be treated alike. *El Souri v Dep't of Social Services*, 429 Mich 203, 207; 414 NW2d 679 (1987). ... When a ... classification is challenged as violative of equal protection, the test to determine its validity depends on the type of classification and the nature of the interest affected. *Dep't of Civil Rights v Waterford Twp*, 425 Mich 173, 190; 387 NW2d 821 (1986).
> *Thompson v Merritt*, 192 Mich App 412, 424-425 (1991).

The standard of review to be applied to race-based classification is strict scrutiny. *Adarand Constructors, Inc. v Pena*, 515 US ___, 115 S Ct ___, 132 L Ed 2d 158 (1995). This standard applies when the race-based government action is remedial in nature. *id.*

Plaintiff has the burden of showing that the totality of the circumstances give rise to an inference of race-based discrimination. *Haberkorn v Chrysler Corp.*, 210 Mich App 354 (1995). To survive judicial scrutiny, the racial classifications must serve a compelling governmental interest, and must be narrowly tailored to further that interest.

Defendant has established a policy of affirmative action which it has implemented through its augmentation certification process.[12] This procedure gives rise to an inference

---

[11] Exhibit 21, pp.22-23; Exhibit 22, p. 22, Exhibit 23.

[12] See Policy Statements Exhibits 21, 22, & 23. And Exhibit 4.

of race-based discrimination, such that the burden shifts to the defendant to show that the racial classifications serve a compelling governmental interest, and are narrowly tailored to further that interest. Defendant implemented the affirmative action policy "to overcome present effects of past exclusion or discrimination, or both, in carrying out its promotion, retention, and other personnel actions with regard to race, color, national origin, or handicap status."[13] The affirmative action program was developed with the knowledge that non-discrimination alone had been insufficient to assure equal opportunity.[14]

Defendant's goal was to attain 13% minority representation in the personnel ranks. This goal has been achieved and exceeded, yet Defendant continued to use the "augmentation certification" process for promotions. Defendant continues to consider race and gender in its promotional decisions.[15] While the goal represents a legitimate interest, the continued use of "augmentation" after attaining that goal is not narrowly tailored. The race-based augmentation policy is an unconstitutional discrimination.

Plaintiff also challenges the same policy based on gender discrimination. To be upheld, this gender-based classification scheme must further an important governmental interest and be substantially related to achieving that interest. *Craig v Boren*, 429 US 190; 97 S Ct 451; 50 L Ed 2d 397 (1976), reh den 429 US 1124 (1977).

Defendant's goal, pursuant to the Consent Decree was to graduate at least 50 women into the position of Trooper 07 (Trooper I) over four academy classes. As early as 1990, this

---

[13] Policy Statements Exhibits 21, 22, & 23.

[14] Introductory notes to Affirmative Action Plan.

[15] Deposition testimony Coronal Michael Dean Robinson. (42).

12

goal was exceeded.[16] According to the Consent Decree, Defendant was to propose a secondary, long-term goal[17] for participation of women in law enforcement with the Michigan State Police. The goal with respect to woman did not change. Defendant continued its augmentation policy with respect to women despite achieving its expressed goal. The gender-based augmentation policy cannot be said to be substantially related to achieving a goal which was realized as early as 1990. The gender-based augmentation policy is an unconstitutional discrimination.

Plaintiff has also challenged Defendant's policies based on age. Absent a fundamental interest or suspect classification, the burden is placed on Plaintiff to show that the classification is arbitrary and not reasonably or rationally related to the object of the policy. *People v Perkins*, 107 Mich 440 (1981).

> Age is not a suspect classification for equal protection purposes. *Massachusetts Board of Retirement v Murgia*, 427 US 307, 313-314; 96 S Ct 2562; 49 L Ed 2d 520 (1976), Johnson v City of Opelousas, 488 F Supp 433(WD La, 1980).
> *id.*, p. 443.

Plaintiff has not established that there exists any arbitrary distinction based on age. Further, any discrimination which has occurred due to Defendant's promotional policies appears to be rationally related to the object of that policy, to overcome present effects of past exclusion or discrimination.

---

[16] Exhibit 21, p.26.

[17] ¶ 4.(c) of the Consent Decree provides:
Not later than two years from the entry of this Decree or the graduation of those four classes, whichever is sooner, the defendants, based on their experience with women in general police work, will propose to plaintiff a long-term goal for participation of women in law enforcement with the Michigan State Police.

13

Plaintiff has established that he was at least as qualified, or more so, than several applicants who were promoted after being placed on the promotional roster as a result of augmentation based on race or gender.[18]

Fashioning an appropriate remedy in this case is problematic. After having considered numerous alternatives, the Court is satisfied that the following award and remedy is appropriate.

Plaintiff may have injunctive relief, enjoining Defendant from making promotions based upon criteria other than that which is contained in the 1963 Constitution, Art XI, § 5.

Plaintiff is awarded damages in the sum of $850,000.00. Said damages are not to be construed as cumulative to the amount awarded in the Circuit Court action.

Plaintiff shall submit a judgment in conformity with this Opinion within ten (10) days.

MAY 0 8 1996                                   DANIEL A. BURRESS
_____                            _____
Date                                           **Daniel A. Burress**
                                               Court of Claims Judge
                                               by Assignment

---

[18] See testimony, Captain Chris Hogan, February, 5, 1996; Lt. Britt Weber, February 6, 1996; and Lt. John Behnki February 6, 1996.